## In re Lemisch

*C. Brewster Rhoads*, for Committee of Censors.
*Edward A. Kelly*, for respondent.

PER CURIAM, April 15, 1935.—This matter comes before us in the manner described in our opinion in the Herbert W. Salus case. It is a rule to show cause why the respondent should not be disciplined for unprofessional conduct, specified in the rule as follows:

"And, in particular, for having been guilty of unprofessional conduct, in that he has formed agreements or understandings with persons known to be mem-

bers of criminal organizations engaged in conducting extensive unlawful gambling operations, to represent professionally and to defend them and their subordinate agents and operatives should they or any of them be at any time thereafter arrested and charged with violations of the laws of the Commonwealth against gambling or crimes related thereto; and in that he did, in pursuance of said agreements or understandings made in advance of said arrests and in contemplation of the future commission of said criminal offenses in promoting the operation and unlawful purposes of said criminal organizations, thereafter himself, or by and through his professional associates acting for him, represent many such agents and operatives when brought to hearing and trial in the courts of justice, and did directly or indirectly receive pay for his said professional services from the principal members of the said criminal organizations aforesaid."

To the allegations and charges embodied in the rule the respondent filed an answer making denial.

In our opinion in the case of Herbert W. Salus, we discussed the illegality, indeed the actual criminality, of the receipt of retainers from a banker in the numbers game to defend his subordinate agents, if, as and when they were arrested charged with crimes to be committed. We also discussed the measure of proof and pointed out that admissions of the receipt of such retainers are ample evidence, as is also proof of the establishment by a banker of a line of credit with the lawyer for the fees for the defense of his subordinates, and finally that guilt might be established by circumstantial proof.

In the Werblun case there was confession of the receipt of illegal retainers. In the H. W. Salus case the circumstances were sufficient. In the instant case the respondent's impropriety is shown by his admissions and by circumstances even stronger than those in the Salus case. In this case, as in the last mentioned, there is the proof by many of the humbler criminals that they were temporarily released on copies of the charge, were later furnished bail, and finally were defended in magistrates' hearings and at the trials, without cost to them and without their knowledge of how the bail or attorneys' fees were obtained or paid, and that they were defended by the respondent or his employe, Brodsky, retained by someone whom the prisoners did not know and without cost to them; and that neither the respondent nor his employe were paid a fee or asked for one from the prisoner.

In the instant case, there is one case of direct proof by the respondent's books that the fee was paid by a banker, and there are 14 others of the humbler criminals who testified to such facts as we have recited above. These persons were James Johnson, James Walker, Gladys Bryant, Tracy Johnson, Anthony Vendry, who spoke of his own case and those of three others arrested with him; Myrtle Fletcher, Fred Kane, Harry Latinsky, Marty Martel, Dominick Latonzia, William H. Albertson, "writing" for one "Augie", who sent him to the Lemisch office; Ralph Maglietta, Sam Martone, and Herman Cohen.

Besides this, the respondent frequently represented several of the most prominent of the numbers racketeers, Barsky, Taylor, Leonard, Boyne, Banks, Horwitz, and Rosen. To be sure, respondent says that he represented them in other matters than the numbers game but his admitted intimacy with these people furnished him ample opportunity to enter into the illicit retainers that are indicated by the other circumstances of the case.

It is true that in most cases Mr. Lemisch sent his employe, Mr. Brodsky, to defend the "writers" and "pick-up men", but Mr. Brodsky acted under the respondent's direction, and defended only those men whose names were upon

the list furnished to him. In one case it was shown that he refused to defend a prisoner not named upon the list. And in no case did he ask or receive a fee.

When we add to this respondent's own admission that it was common knowledge in his office that his firm was retained by the higher-ups, there can be no doubt of the fact, and of his own knowledge of it.

Mr. Lemisch's own statements to the committee concerning his personal connection with bankers in the numbers game were that he was ignorant personally of any illegal retainers. But he went on to say that "he had heard that Felger received a weekly retainer". On the other hand, he admitted that Felger attended only to the civil business. It is difficult to understand how Mr. Lemisch at first, and later with the aid of Brodsky, attended to all of the criminal business of the firm and that Felger took no part in that part of the business, but could be ignorant of the method by which the firm got the business which occupied all of his attention. Could he be ignorant on the subject under the circumstances? He knew he was paid no fee. He never asked a defendant "pick-up man" to pay him. And if the prisoner did not pay the fee he must have known someone else did. He knew the defendant did not meet Felger, for Felger, as we have said, took no part in the criminal business of the firm. He knew, too, that the higher-ups, six or eight in number, whom we have named elsewhere in this opinion, were clients of his office. He personally dealt with them. It is taxing our credulity to ask us to believe that he took no interest in the payment of fees, or even in the fixing of them, for the work that he personally did.

However, it is unnecessary to labor the point, because he admits "that he had heard that Harry Felger got a weekly retainer", meaning for the numbers cases. We have commented elsewhere upon his duty when this knowledge reached him. It did not move him even to inquiry of Mr. Felger, and it did not prevent him sharing in the retainer. And yet to Mr. Lemisch it alone must have furnished a complete explanation of the failure of the prisoners to pay him for his services. He testified: "It was said Mr. Felger had been retained on a weekly basis.

"Q. For what kind of work? A. For number work. . . . Q. By weekly retainer you mean a retainer from one or more of the higher-ups in the number game to take care of subordinates? A. As arrests arose, yes."

After Felger's illness, Mr. Lemisch says that he went on representing number cases, and got no fees from them, that Felger attended to the fees. He was asked, "And those fees came, not 'fee per defendant' you represented, but some sort of lump sums that were being paid Felger by some unknown?" to which he answered, "Absolutely, yes." "And you are quite sure that during this time 10 months before his death practically all the numbers cases that your office represented were not paid by individual fees but by certain lump fees on arrangements made between Mr. Felger and higher-ups whose names you do not know? A. Up to December." Again he testified: "Q. Did you not know that you and Brodsky were in the retainer of the higher-ups to represent subordinates in the numbers game?" He properly exempted Brodsky from connection with the matter, on the ground that he was a mere employe, but as for himself he answered "Yes" to this question. His examination went on:

"Q. You mean that you knew by indirection, at least, if not directly, that your office representation of the numbers game was on a retainer basis by the higher-ups? A. I say by indirection, yes. Q. How about saying that you knew it directly? A. No, I did not. Q. When you say directly, you made no inquiries about where the fees were being paid? A. That is true. Q. You did not make inquiries because you felt reasonably sure, from what you knew or did not know, that that was being taken care of by these higher-ups paying lump sums

to your firm? A. That is a fact, that I had an abiding faith that whatever Mr. Felger did was the right thing to do."

If he had been ignorant of what Mr. Felger was doing, his confidence in him might justify him in assuming that Mr. Felger was acting rightly. But when he knew that what Mr. Felger was doing amounted to a criminal conspiracy, his general faith in him did not justify the respondent in aiding and abetting a crime.

Asked about the retainer, he said, "We heard it in the way we hear all these things and we *asked no questions.* . . . We heard it from those in the office and discussed it." It is true the respondent says that Felger alone profited by the retainer; that he, the respondent, got none of it. This is to us incredible. It means that all of one partner's time, and the services and salary of an attorney, employed by the firm were paid by the firm, and the fees appropriated by a single partner, who did none of the work.

But it is beside the point whether the statement is believed or not. The respondent was as much a party to the criminal conspiracy between his partner and the chief criminal, if with knowledge of the conspiracy he did the active work of carrying it out, even if the only profit he made was his continued connection with the firm.

The plea that he was under the domination of Felger, his dead partner, who made the illicit arrangement, is no excuse. His plain duty, the moment that he heard from the gossip of the office that Mr. Felger was receiving improper fees, was to demand an explanation from Felger, and in the absence of a denial, because there could be no satisfactory explanation by the latter, to have withdrawn from the firm. He did neither, but admits that he complacently continued to participate in the unlawful business, in other words, to carry out the conspiracy by appearing for and defending the minor conspirators. Nor does there appear to have been any change in the practice of the office during Felger's prolonged and finally fatal illness. During that period of 6 months, at least, he cannot shelter himself behind his dead partner. Nor was there any lessening in the volume of the cases in the office after Felger's death.

The efficacy of the arrangement between the Lemisch office and the backers is illustrated by the Rothman case. Rothman, Weisberg and Kafsky, three "muscle men" of the Sixty-ninth Street "mob", the worst racketeers engaged in the numbers game, were arrested charged with carrying concealed deadly weapons. Kalman, an employe of the Lemisch office, was called on the telephone and within an hour he and Brodsky were at the magistrate's office. Later at the trial Mr. Lemisch represented the defendants.

William B. Seitchick is a professional bail procurer. His business was a large one. Commencing January 1, 1933, the greater part of it was furnished by the Lemisch office and aggregated $100,000. Most of this was in lottery cases. They averaged eight or nine bail bonds a week. Seitchick dealt with the firm through Charles Kalman. He never looked to the prisoner for payment of his fee for entering the bail, but only to Kalman, who, he always assumed, was acting for Gartner and Lemisch. He never inquired into the financial ability of defendants, nor was he ever paid by them.

Charles Kalman was an employe of the respondent's firm. He testified that he heard a year ago that fees in lottery cases were paid by the "higher-ups". He knew that numbers of the defendants were going to have their fees paid by Banks, who was a backer, the "higher-up" in the lottery game. "When Banks called up to get somebody out I knew we were getting him out for Banks." He was an unwilling witness and professed to know nothing about any retainers,

but he naively stated that, as between the pick-up men and the banker, the banker was the office client.

We are now of opinion that we should have sustained respondents' objection to part of the testimony of one Mercer and Lassiter, wherein Mercer was permitted to say that Narcisse told him Werblun, Brodsky and Lemisch were his attorneys, and Lassiter to say that Leonard told him that Lemisch was his attorney. We now sustain the objections, and strike this testimony from the record. We have not considered it with respect to any of the respondents.

There can be only one conclusion from the evidence, and that is that Mr. Lemisch permitted himself to become a party to a criminal conspiracy to violate the lottery laws. It is hard to believe that he was not a party to the illicit retainer from the beginning. It was he who had charge, for the firm, of all of its criminal business. He was an intimate of the leading criminals. His partner Felger, upon whose shoulders he now seeks to lay the burden of making the original criminal contract, admittedly attended only to the civil business of the firm. But whether or not it was Felger who accepted the retainer, and whether or not Felger kept all the illegal fees, the respondent Lemisch knowing the facts continued for months to carry out, perform and abet the crime.

There can be no question that he was guilty of unprofessional conduct and that he is unfit to enjoy the office and privileges of an attorney of this bar. He should be disbarred from further practice as an attorney.

In view of all of the foregoing the court enters the following:

### Decree

And now, to wit, April 15, 1935, upon consideration of the rule entered by the court and after hearing thereon, it is ordered that the rule be made absolute, and that the respondent, Bernard L. Lemisch, be and is hereby disbarred from practicing at the bar of the Court of Common Pleas, the Orphans' Court, and the Municipal Court of the City and County of Philadelphia, and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary to the Supreme and Superior Courts of Pennsylvania, the several Courts of Common Pleas, the Orphans' Court, and the Municipal Court of the City and County of Philadelphia.